May it please the court, my name is David Anthony. I represent the petitioner Jimmy Todd Kirksey in this appeal. I would like to reserve six minutes for rebuttal if I may. This case was originally a capital case where the most important piece of evidence relating to the proceedings, a supplemental competency report which reversed the opinion of the examining psychiatrist, was authored by the trial court and then was placed into the record by the trial court and represented that it came from the expert. Mr. Kirksey. I thought at the hearing he subsequently confirmed that that indeed was his opinion and that was his signature on the report. Isn't that the state of the record? Your Honor, there are two hearings. I think that the court may be referring to the 2006 evidentiary hearing where Dr. Master testified. I believe, I mean I was at that hearing. When Dr. Master testified, when he started his testimony, it appeared that he attempted to try to embrace both reports. The first one was the May 23, 1989 report stating that Mr. Kirksey was incompetent and at the same time he attempted to adopt the supplemental competency report, which was the June 22, 1989 report. But on the basis of that testimony, we then have a factual finding by the, I guess it was the Nevada State Courts, that that was in fact his opinion and that there was no overreaching by the trial judge in obtaining that opinion. So isn't your burden on habeas to convince us by clear and convincing evidence that that state court finding of fact is erroneous? Judge Gates' factual findings were that Dr. Master testified that Mr. Kirksey was incompetent. That was, at the hearing, he was forced to try to reconcile those two opinions. Well, I'm not sure you're addressing my question, Mr. Anthony. I'm trying to figure out how I get over the AEDPA tough standard with regard to the deference we must give to state court findings of fact. I think that one way we get over the AEDPA standard is that, I've argued in my brief that the state court's decision here was contrary to clearly established federal law. In what way? Because the state court imposed a harmless error finding into its decision about whether Judge Lehman was biased. In other words... Wait, wait, wait, wait. Forgive me. Judge Tommins asked you about what the doctor said. Let's assume for a moment that the trial court erred. But what ultimately came out, if I understand it correctly, is that Dr. Master said, yeah, what's in this report, what's in this opinion, is my opinion. I think this is correct. Under the circumstances, how could there be prejudice, getting back to the AEDPA concern again? Well, let's talk about prejudice because I want to address that in one package. First of all, we have a claim of judicial bias. That's one of the claims. That's claim two in the petition. As to the claim of judicial bias, it's my contention that it doesn't matter. It doesn't matter what Dr. Master's ultimate opinion was. It's my contention that a judge who would take an expert opinion would go back and would participate in... Wait a minute, wait a minute. If I understand the record correctly, the judge asked the court to contact Dr. Master. Is that correct? I'm not sure if he asked. I thought he did. An open court said, this is what I'd like to do on the objection, if I recall correctly. If that's correct, and he did that, and it came back and nobody objected to it, and then later on the doctor confirmed the accuracy of what the judge did, doesn't that really put him in the role of a shribner? Whatever his personal view, he is effectively writing down what the doctor ultimately confirms is his professional opinion. Isn't that correct? We don't really know. Well, you may not know, but you have the burden to show, do you not, that the trial judge's actions were so prejudiced and so biased that it affected the outcome of the case. Isn't that correct under AEDPA? Well, I don't think it's correct about whether it affected the outcome of the case. I don't think that's true. I think that as to the claim of judicial bias, it does not matter whether or not the contact with Dr. Master affected his ultimate opinion. Can you explain that? How is the judge biased? Just by simply doing what he did, that he's biased against your client? By contacting an expert off the record on a material, the most material question in the case, and by participating in the authorship of the supplemental competency report, we have a judge who has crossed the line and has made himself almost a fact witness here. He's adopting an adversarial stance here. He didn't contact Dr. Jurasky, the other expert who found that Mr. Kirksey lost confidence. I thought there was some question of whether or not Dr. Master had addressed all of the competency. He had testified, and he admitted later, it looks like, that his gauge for competency was whether or not, or based on his review of Mr. Kirksey, the fact that he wanted to have the death penalty imposed upon him, that was it. That was his criteria. It seemed like it was suicidal. It didn't make sense. It reflected poor judgment. But he didn't address the standard elements for competency and whether or not he could assist counsel, whether or not he could make a decision right from wrong. So I think there was some discussion about that. That's when the judge said, I'm going to contact him. I think it was, does anybody have any objections? There was no objections. He contacted the doctor. I'm not endorsing the practice. In fact, it's questionable. But we're way down the line here, and we're limited with respect to our review. And so the question is, how, in light of those additional facts, does that show bias by the court? Because apparently, later, Dr. Master testified, yes, that was my opinion, and yes, that's my signature. I ended up signing off on that, basically when pressed. Let me address the first issue that the court mentions about the follow-up. I don't think that there was judicial bias because the court wanted answers to the questions about competency. That's not bias. I'm not saying that was improper. Can you explain what is your argument with respect to bias? The argument with respect to bias is that it wasn't a subsequent contact that occurred on the record, and there was no evidence of what the nature of the contact was. It was a contact that occurred off the record, and during this contact, whatever it was, the judge authored the competency report, finding in definitive terms that Mr. Kirksey was competent. Wasn't that the subject of the hearing? That's why they had, ultimately, Dr. Masters and the trial judge testify. And on the basis of that record, the Nevada Supreme Court said, the trial judge shouldn't have done it. It should have been done on the record. But we don't see any evidence here of bias, and the doctor basically confirmed that that, in fact, was his supplemental opinion in response to the court's questions that Judge Merguia identified that the doctor had not answered the first time around. One of the things that the court's been mentioning here is Dr. Masters' opinion, so maybe I can talk about that a little bit because— To the question that I asked you, and that is, what evidence do you have to convince us that the Nevada Supreme Court's factual finding that there was no bias is erroneous under a clear and convincing standard? Their finding that there was no bias was predicated on the assumption that there would only be bias. We have always argued that that is a question of prejudice. That is not relevant to the question of bias. It is not relevant whether or not what he did affected the outcome of the proceedings. But didn't they specifically say we do not see any evidence of overreaching here? In other words, the trial judge didn't browbeat the doctor into changing his opinion. We've got that finding, do we not? If you look at the record, what you have is Judge Layman and Dr. Master testifying they have no independent recollection. They have no independent recollection of anything, but they're sure that nothing wrong happened. But don't you think that if the psychiatrist felt like the trial judge had leaned on him, that even if he didn't recall specifically what the judge said, he would have said, well, that's what I wrote, but I did it because it was the judge on the phone who was asking me to do it. I don't know why we would assume that, but let me bring up a point here. But you're not helping me find out how, under the constrictions of AEDPA, that I can get to the point you want me to get to, to grant you relief. So let's talk about the state court record. In 1993, Dr. Master testified at the first post-conviction evidentiary hearing. He testified at that proceeding that Mr. Kirksey was incompetent to be sentenced. Nobody, including the Nevada Supreme Court, including any state court, has ever acknowledged that uncontradicted testimony from 1993. So when the court asks me, what do we do with Dr. Master, what do we do with Dr. Master's testimony from 1993? Let's look at that. No one's looked at that. Now let's combine the 1993 testimony, when it was fresher in his mind, with the 2006 evidentiary hearing testimony, where he's confronted and he says, the way I resolve the inconsistency, I adopt the initial opinion. That's what he testified to. Now when Judge Gates made his factual finding in the minute order, which went into the findings of fact, he said, Dr. Master testified that he was incompetent due to suicidal ideation, but I find that I don't credit that because he obviously has some affinity against the death penalty. That was the factual finding by Judge Gates. Why is it impermissible when you're trying to assess the credibility of an expert witness to decide that the expert witness is biased? It's not impermissible, but the basis that you find him not credible should have some basis in the record. What basis is there? Wasn't the problem, Mr. Anthony, that under Nevada law, that's not evidence of incompetency? Suicidal ideation? It doesn't matter what state law is regarding suicidal ideation. Under DROP v. Missouri, suicidal ideation and an attempt at suicide creates a reasonable doubt as to competence. I've been arguing since state court that there was a reasonable doubt as to Mr. Kirksey's incompetence because under DROP, an attempt at suicide is sufficient to trigger a competency hearing. He was examined, was he not, by both of the psychiatrists who then prepared the reports that were submitted to the trial court? Mr. Kirksey received the same 10-minute evaluations from both of the psychiatrists. Is the answer to my question yes? They received examinations, correct, Your Honor. Let me ask you about a slightly different issue. Putting aside for a moment the merits of what you're talking about, don't you have an EDPA timing problem here? It seems like you've got issues of the statute of limitations. You've cited Martinez in one case, but these are not Martinez facts here. Help me with how you get past the statute of limitations and the equitable tolling issues that you've raised. The reason that the claims that are here on the appeal were found untimely is because the court said that there was an 88-day delay that occurred in 1991 to 1992, way before the existence of the statute of limitations. And because of that delay from 1991 to 1992, the district court held that Mr. Kirksey did not have one year after the denial of his first habeas corpus appeal in order to file a timely federal petition. Is it your position that—EDPA was enacted in what, 1995? 1996, Your Honor. Okay, so is it your position that by that very fact that applying the statute of limitations is somehow unconstitutional if it's retroactive in this case? I would say yes, but I don't think we need to go that far because it's not up to me, it's up to the court. And the court said in the Patterson case that a person like Mr. Kirksey, who has a pending first state habeas at the time that EDPA was enacted, has one full year to file a timely petition. From what point? From the finality of the state court's decision. And in this case, when do you think the Nevada Supreme Court's judgment was final? Was it the date of the remitter or something else? The date of remitter was issued on March 13, 1997, and my argument has consistently been that Mr. Kirksey had one year from that day. So that's just one. I made a lot of alternative arguments about the timeliness, and I want to make sure that I'm addressing the court's concern, but I think the very easiest way to cut through this is to say that Mr. Kirksey had one full year, just like Patterson says he has one full year. Yeah, but one full year from when? One full year from April 26 of 1996 after EDPA went into effect? No, I said that he had one full year from March 13, 1997, which was the date of the issuance of the remitter. Well, I mean, under the statute, even though the crime was pre-EDPA, in essence, the clock started running again when EDPA was effective, correct? But it tolls under 2244D2 until the finality. If he has a pending proceeding, which he did for some period of time. I guess the way that I looked at it was that the clock for him started ticking on January 4 of 1997 when the Nevada Supreme Court denied rehearing on his state PC, and then that makes the March 21, 1997 federal petition timely, but not the January 26, 1998 petition. I've cited to the court in my briefs the Buffington case. The Buffington case is from the Nevada Supreme Court, where the Nevada Supreme Court is saying what finality means under Nevada state law. No one has ever addressed Buffington, no one has ever disputed it. Buffington says that their case is not final until remitted are issues. That was the same approach that Texas had in Lawrence v. Florida. That was the same approach that Texas had in Gonzales v. Thaler. So the idea that remitted are can't be that way just isn't the case. So I've only got three minutes left. Can I reserve that? Sure, yeah, absolutely. Thank you, Your Honors. Good morning. May it please the court, Vic Schulze for the State Attorney General and for the warden. If I could address the statute of limitations issue first. It's based on a complete misstatement of law, if I could. Finality occurred back in 1992 when the finality of the judgment occurred in 1992 when the United States Supreme Court denied certiorary on the direct appeal in this case. The case law from the circuit courts in the U.S. Supreme Court for a pre-AEDPA finality case is when President Clinton signed AEDPA in April of 1996. If it's a pre-AEDPA JOC, that initiates the beginning, the running of the one-year statute of limitations under the theory that you get the one-year grace period. So you don't suddenly start with the statute of limitations and the guy is done before he starts. And we all agree that's fair. That happened in this case. When I filed the motion to dismiss in this case, I noted that the 1997 U.S. District Court petition was timely. I had no problem with that case. It's the 1998 amended petition and all the petitions after that that were untimely. That 1998 petition, by my estimate, was 22 days late because the AEDPA starts running and the first petition is filed in March of 1997. 76 days of untold time had been used up. There were 289 days remaining. The amended petition was filed in January of 1998. According to the cases that we cited, Kerry v. Saffold and all the other cases, it is a cases pending, a post its decision, not remittitor, but when the decision is made, denying that case. That seems to be the universal rule on when tolling stops. From that day, measuring the time period of tolling, the 1997 petition was timely. The 1998 Federal petition was 22 days late under my counting of the days. What I don't understand about Mr. Anthony's argument is he's saying that somehow as a matter of Federal law, that the JOC in this case, the conviction became final in 1997. That's an impossibility because the U.S. Supreme Court denied cert on the direct appeal in 1992. That's a U.S. Supreme Court issue. And so what he's somehow, what Kurtz is trying to argue is that you wrap up all of the state post-conviction stuff in the post-conviction appeal, and that defines finality. If that's true, then there's no pending. That somehow turns the AEDPA statute on a pending post-conviction petition tolling the time period on its head. That doesn't make sense. Let me just be sure I understand. As I understand it, the Supreme Court's decision became final on December 2nd, 1991. I would agree. From your perspective, that ended the timing on the direct appeal, right? Yes, sir. Everything else gets measured. Yes, but then we get the one-year grace period after Clinton signed AEDPA in April of 96, so we get... I believed in good faith. I figured all that into my motion to dismiss, and I think the district court judge followed that correctly. On this 88-day issue, it's surplusage. It would be a good argument, as I point out in my brief, except it doesn't go anywhere because it's complete surplusage because the timeline that I argued and the timeline that the judge followed in this case still complies with AEDPA. So I think that's that 88-day argument that somehow there was a pre-AEDPA time period that Kirksey was required to follow. It's a red herring argument. It doesn't matter. The 1998 petition was late under AEDPA. Now, if I could go back, if I could return, because the court seems to have a lot of interest in the competency report, and I agree with the court. I'm not here to defend Judge Layman, but look at this from Judge Layman's standpoint. There's a motion for competency filed because the guy wants to plead guilty straight up to what used to be a capital case. And I've got to tell you, back up just for a second, these are some of the most respected psychiatrists in Clark County, Nevada, and everybody in Nevada knows these names. Jurasky comes back and says, I've looked at him. The guy's competent. Master comes back with this report. The judge gets the report, holds that live hearing, and says, and I'm paraphrasing, I don't have a clue what Master just said in this report. This judge is obligated under the Constitution to apply drope, the drope factors from 1975 or 76. That was the controlling law that Layman would have been looking at. He reads this report about suicidal ideation and clinical depression, and he says, you know what, and again I'm paraphrasing, I don't have a clue if I can't read the report. The report doesn't say anything about drope. So he says on the record to the world in open court, I am going to, and you all know this, you've reviewed the record, I'm going to contact the doctor and find out the drope factors because he's obligated to do that. There's no objection. We all agree that what he should have done was to have Dr. Master come into the courtroom. Agreed. I agree with that. But he did tell everybody that's what he was going to do, and there was no objection raised at the time. That is correct. And the Third Circuit in the Green case that we cited, a case almost on all fours with this case where impropriety was not found notably, in that case there were some suggestions made to U.S. district courts on the better way to handle this issue, which is do something on the record. And I absolutely agree. The Nevada Supreme Court was not happy with what Layman did, and I think the U.S. district court below was not happy with what Layman did. But the ultimate question is, is that bias? Because it goes to bias and whether or not the judge was impartial. Because how can we be certain that the judge's contact with Dr. Masters didn't influence Dr. Masters? Because Dr. Masters said it didn't. Master testified twice, in 1993 and 2006. He said it's my signature. Those are my conclusions. He also said I was not coerced. I was not, and again I'm paraphrasing from the transcript, but he said I was not something to the effect I was not coerced. The judge didn't try to influence me. Those are my conclusions. That is my signature. That is my report. That's how we know. Also. And under AEDPA, how are we to treat that? That is a finding of fact that is worthy of deference under AEDPA. The State courts made that finding of fact. You've got the testimony that supports. We don't say that procedure was so outrageous. I do not think the procedure is outrageous. Let me tell you what, let me tell you the problem, the lack of a link or a causal link between what the district court judge did in this case and bias. Because this is an important issue. You just said you don't think it's outrageous. Is that just your opinion? I mean, why isn't that just outrageous? Why is it not outrageous what he did? First of all, he announced it. I think everybody can agree that the first Master report did not address the drope standards. You have a judge who is constitutionally obligated to apply those standards from the U.S. Supreme Court. He announces an open court. I don't understand this. It doesn't address. We all have obligations, but we don't do it, you know. I understand. But then he says in open court, I'm going to contact the doctor and ask him about the drope factors. You then get a report that comes back and says, under the drope factors, he's competent. You then have Master in 1993 and in 2006 testify. I submitted that report to the court. He's asked in the 1993 hearing by Patty Erickson, Kirksey's attorney at the time, did you submit a report to a second report to Judge Lehman? Answer, yes, I did. They discussed the report. They then discussed the report again in 2006. Master confirms it. All these discussions going on with the judge. Let me address what I think is the heart of your issue, Judge. Could he have done it better? Yes. Could he have made a better record? Yes. But the problem here on bias is, based on Kirksey's standard, every single time a district court judge at the state level or at the district court level or if it, I don't know that it ever happened, but if it ever happened that the U.S. Supreme Court found this court had made a mistake and was reversed, it seems to me that Kirksey's argument is every time a court makes a mistake, you have to presume bias because the court didn't do it right. And there is no such presumption of bias simply because a lower court makes a mistake. And I think ultimately that's the argument here. But it's not just a mistake. It's the type of mistake, I think. Do we not look at that? But it was, I think ultimately the argument is here that Judge Layman made a mistake, therefore he's biased. I think we know there was no outrageous conduct, in addition to the constitutional duty that Layman was trying to follow, because Master ultimately testified it was his signature, they're his conclusions, it was his report. My reading, my conclusion of his testimony is that there is no error, there's no mistake. There was some type, some evidence that the typewriter was the same as the judge's typewriter. Yes. Did that wear out? Nevada Supreme Court made a finding in the second, it was either the second post conviction, the ultimate ruling, or it was in the order of remand on the district attorney's mandamus petition. I think it was in the prior. They made a factual determination that it was never conclusively determined who typed up this report. But let's make an assumption here. Let's assume that the judge does what he says he's going to do. He calls Master up and he says, tell me about your report. I don't know what it means. It doesn't address the drope factors. Let me tell you the factors I think you need to address under the U.S. Supreme Court decision. He lays them out. Does the client understand factually what's going on here? Does he understand the proceeding? Can he assist in his defense? Master says yes. The judge may, and we don't know this, but the judge may then have said, all right, I'm going to have my secretary type up a letter type report based on the drope standards. I'm going to send it to you. If you agree with it, sign it. If you don't, don't sign it. Now, I'm speculating. I'm a little uncomfortable doing that. But we don't have any testimony at all to that effect. No. No, because my recollection of the 2000, the later hearings, is nobody had any memory on how this thing was produced. I guess one of the questions that occurs to me is how does the judge get a piece of the doctor's letterhead in order to No, his first report was on letterhead. The ambiguous report was on letterhead. The second, the supplemental report was not on letterhead. It's on plain paper. The implication might be that the judge's secretary typed up, and she may have. But, again, look. Because the doctor's name was misspelled. It was misspelled. It was masters instead of master, and he made that mistake repeatedly. But, look, the reality is in state court, lawyers prepare orders for judges all the time. That's essentially what happened here. No. No, that's not what happened. Well, but the roles are different. When does a judge type up a report for a doctor to sign off on? After he's talked to the doctor. I understood. And we assume had a conversation addressing these factors. I understand that the roles I'm concerned. I know what the Nevada Supreme Court decided, and I think that's the question, is whether their determination was reasonable in light of this procedure that took place in, at the time, a debt penalty case. Right. Understood. Two more points I'd like to make that I think are right on point. And I know it's 10 years later, and so it's less relevant. But 10 years later, the FPD has Kirksey reevaluated, and Dr. Schmidt, and his report's in my SEOR that we submitted. Schmidt, again, cannot find a lack of competency. So now he's been evaluated three times, two psychiatrists and a neuropsychologist. He's been found competent. His attorney testified at one of the two evidentiary hearings and said, I never had a belief that he was incompetent. So now you've got two psychiatrists, a psychologist, and the trial attorney all saying, we think he's competent. If you compare these facts to the Green case that we cited from the Third Circuit, the facts are a little different, but they're kind of surprisingly on point here. And in that Green case, they suggested a better way that the court could have done it, but ultimately they said, you know what, the fact that the court had communication with the court's own expert is not automatically grounds for overturning the conviction. Also keep in mind, these are pretrial proceedings. This is not, as counsel says, the ultimate issue in the case. This is not evidence that goes to guilt. This is not evidence that goes to the testimony of a witness at trial under the state's burden. This is an important issue, but it's a collateral pretrial issue dealing with something that is not going to be the issue at trial. Now, we didn't have a trial because of the plea, but this is a pretrial issue, and I think that Green case provides a whole lot of really nice guidance to the court in this case. And were both the doctors court-appointed doctors, or was one for the government and one for the police? I don't want to mislead you. I am under the impression that these were the experts that were court-appointed because of the motion that Kirksey filed to have the evaluation done. Because Kellis at trial said, well, Judge, one thing you might want to consider if they disagree on the drope factors is simply send the guy up to Lakes Crossing. That's our mental hospital up in Reno. Have him evaluated up there. And the judge said essentially at that hearing, I can't even make that determination at this point yet because I don't have two reports on the drope factors. And I'm always going to get back to Dr. Masters' failure to report on the drope factors. And, again, I think we've got to give Judge Layman a little bit of a break here. He was new. I know you're uncomfortable the way he did this thing, but his overriding concern, and this kills the bias argument, I think, his overriding concern is to fulfill his constitutional duty under drope to get a determination on whether or not this guy is competent. And I think Judge Layman ought to get credit for standing up for that constitutional duty. Let's do this, counsel. Let's assume for a moment that what happened during trial instead of pre-trial. Obviously it's hard to figure on competence. Evidence came up. I could do that. Let's assume for a moment that they had gotten past all of that, they were in the trial, and the same expert were asked to testify. As part of a defense strategy? As part of the defense. Okay. And let's just say that the judge had a question about the meaning of something, and he said, you know, I really don't understand what was said here.  Say it's a judge's trial. And the judge said he wanted to contact the doctor and do exactly what he did here. Is there any doubt in your mind that that would be a reversible error? That's a complicated question. Of course it is. He's good at those. You're way ahead of me on the questions. I think that's a lot more, I will be candid with you, I think it's a lot more problematic, and I think it's problematic because your scenario affects a defense that the defendant's trying to raise. That scares me. I would back up on that. But isn't it true, though, counsel, and here you have something that goes to the heart of Judge McGee. At the time, this was a capital case. It was. This person was going to be executed, theoretically, for the crime allegedly committed. Right. One of the key determinations is whether the guy is competent. Right. The judge contacts the doctor, one of the doctors, on whose testimony he, the judge, relies in making the determination regarding whether all the constitutional protections have been given. Doesn't that, I guess what I'm asking is, is that almost structural? It's not structural error because it's not bias. It's trial error according to what the cases that the district court cited. This is an issue of an ex parte communication. That is trial error according to the district court's order. He did a harmless error analysis. In this case, we know that ultimately when you focus on the drug factors that Master was supposed to focus on as a forensic psychiatrist, and he knew better than this, I think. When you focus on those . . . When you review the fact that the defense counsel failed to object, is this plain error review that we're looking at at this point? According to the district court judge in this case below, he said that was . . . I don't want to use the word probable. He said it was arguable waiver of the issue because he didn't object at that point in time because he knew exactly what the judge was going to do. And the judge said, I'm going to talk to the guy, and everybody in the courtroom is silent. Nobody says anything. But if it's not waived and we go forward, then aren't we looking at the standard of plain error? And, of course, the third prong of that is whether there's a real injustice that's done. Isn't that what we're looking at here? I'm putting that EDPA to the side for a moment. I don't know because I'm a habeas lawyer. I don't know how to put EDPA to the side. I mean, I've been so indoctrinated by EDPA since 1996. But the plain error standard, as we know, it generally applies on direct review. Yes. This is a deferential facts standard in this case under EDPA. If we were reviewing this on direct appeal . . .  But this court has noted repeatedly that if . . . How many opinions have I read from this court that have said, if we had this case on direct appeal from a federal conviction, our analysis would be completely different? And, in fact, it would be. That's what Congress intended. You're absolutely right. Absolutely. You just said that the doctor, you know, he was going to look at both reports, and if they were competing, then he would go to the third one. That was the suggestion of the . . . That's what they discussed at that first hearing. Well, they were competing. Let me address your issue as to . . . I'm going to answer your question directly. The allegation has been made here that Layman authored the report. Let me suggest a different way to look at the facts. The U.S. Supreme Court authored that supplemental report because Layman quoted the drop factors. The drop factors were in that report. That was authored by the U.S. Supreme Court. Nobody made those factors up. As far as your question is, did Master find him to be incompetent in his first report or when he started to retrench in his 2006 testimony? It's a fascinating question, but it's not just factual. It's legal. The answer is no, he didn't, because the second Master deviates from the drop factors. His testimony is irrelevant. Well, another way . . . So he did not . . . I'm talking about the procedure here, and the procedure here is what I've been focused on. He clearly said in his first report, Dr. Master, that he was not competent. He thought he said that, but he wasn't dealing with the drop factors. Well, I understand that, but the word not competent came out. Agreed. I agree. All right. The judge saw that. Well, instead of the judge going to a third doctor . . . No, because as Judge . . . Instead of the judge going to a third doctor, which you said, if he got competing . . . You're right. He did say that. Instead, with this . . . He went off on his . . . If you can't separate the law of drop and the facts in this case, because Layman's first report and Master's first report didn't address the factors, and Layman said at the hearing, and again I'm paraphrasing, the first hearing, I don't understand — and he said specifically it doesn't address the drop factors. He didn't say drop, I don't think. But he said . . . What he said is essentially that the report was incomplete. No, it was not only incomplete, it was totally irrelevant, because it wasn't incomplete. It didn't address the issue that the trial judge needed to have addressed. Yes, absolutely, and he was absolutely right in demanding a report that addressed the drop factors. On that point, Layman was 100 percent correct. The doctor of Master's first report said a comment specifically about the lack of judgment of Mr. Kirkson. Are you talking about Schmitt's report in 1998? I'm talking about Master's first report. I remember suicidal ideation and clinical depression. Reflected poor judgment. That's irrelevant under drop. Well, not completely irrelevant. Can he assist his attorney, and does he understand the factual context he finds himself in a trial? I mean, it's pretty standard stuff. And I've got to tell you, although we're all a little uncomfortable with the way Layman handled this. You're more uncomfortable with it than I am, I think. Well, I'm certainly not going to give him credit like you do. But I absolutely think — and I'll close with this. I'm over my time. I think we have to give him credit for demanding that the psychiatrist deal with the drop factors. And I would point out, on closing, Schmitt made the exact same findings later. He also, 10 years later, could not find lack of competency. Your bottom line, I gather, though, from your pleadings, is that this is an AEDPA case. Yes, sir. And because it's an AEDPA case, it survives either because of timing issues, failure to exhaust issues, or the like. And that's what settles it. And the procedural defaults that were applied under NRS 34-726, the timeliness bar, in the second post-conviction proceeding. Thank you very much. Okay. Thank you, Mr. Shultz. I'm not going to give Judge Lehman credit as a new judge. The second case that he did was also a capital case, and that was recently vacated for judicial bias as well. I cited to that in a statement of related cases. That death sentence was — But we're supposed to decide this case on the basis of a subsequent case? No. I'm just saying that — Why do you tell us this stuff, other than to poison the well? Well, I think it's relevant to what counsel is talking about, about a new judge doing a capital case. What I would say is, is that once that report changed, it affected all of the proceedings in this case. At the point that that report came out, counsel didn't — wasn't an advocate any longer for his client. He literally sat there in a capital case where there were negotiations to make this a second assistance in securing the death penalty. So, it was a material issue. And when it was discovered that Judge Lehman authored this report, there was a hearing with Judge Proe and with the attorney general where the attorney general acknowledged at the hearing in September of 2001 that it was a material issue about the determination of competency because it totally affected the outcome of the proceedings. Counsel, forgive me. Perhaps I don't recall correctly, but I thought that the Supreme Court of Nevada indicated that it was inconclusive whether Judge Lehman had, in quotes, authored the report, in quotes. Is that correct? They did say that, but at the same time — So, you're saying they were just kidding? I'm not saying they were kidding. What I'm saying is they completely ignored a binding stipulation of the parties. But you realize we have to deal with the AEDPA standards. So, how do we deal with this? We've got the Supreme Court of Nevada says that it's inconclusive whether the judge even did this. So, you're saying that the case is over because that judge did this and he was biased, but the Supreme Court of Nevada says it's inconclusive whether he even did it. So, how do we handle it? Under Panetti v. Quarterman, this court's review is de novo if I can overcome AEDPA as to one thing. I've argued that I can overcome AEDPA because the state courts applied harmless error when they should have applied structural error principles. I don't need to overcome AEDPA as to everything. So, your argument is that what — well, first of all, you're assuming that the judge did this, but if he did, you're saying that that is structural error, therefore you have to reverse. Is that right? Since Toomey v. Ohio in 1927, judicial bias has been clearly established as structural error. But let me address the court's question, too, because I think I also am entitled to relief under an unreasonable determination of the facts, because when the Nevada Supreme Court said those things, they didn't acknowledge the binding stipulation of the parties that was read into the hearing at the 2006 hearing. It said — it was based upon our question document examiner who concluded that the suspect competency report did not originate from Dr. Master's typing instrument and that it was consistent with having been produced on the trial judge's typing instrument. I think it was unreasonable for the Nevada Supreme Court to say it was all inconclusive and not to acknowledge that there was a binding stipulation of the parties. I think that was an error. Counsel, you've got about nine seconds left if you want to wrap up. Well, just to wrap up, I think that the statements of Judge Proe were very probative. When he found out that this happened, he said it was very disturbing, no matter what the circumstances were, and he urged the parties to negotiate the case. That speaks volumes to what happened here and how it affected the proceedings and why the first-degree murder conviction is invalid. Well, thank you. Thank you very much. The case just argued is submitted. We will be adjourned until tomorrow morning. All rise. Hearing, hearing, all persons having had business with the Honorable United States Court of Appeals for the Ninth Circuit will now depart from this court for the discussion. Stand adjourned.
judges: Tallman, Smith, Murguia